NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220601-U

NOS. 4-22-0601, 4-22-0602 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 25, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Hancock County |
| CHARLES J. LOZANO, | ) | Nos. 18TR1318 |
|     Defendant-Appellee. | ) |     19CF64 |
| | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Rodney G. Clark, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court erred in granting defendant's motion to suppress.

¶ 2    The State charged defendant Charles J. Lozano with driving while his license was suspended and subsequently enhanced the charge to a felony offense based on surrounding circumstances. Defendant moved to suppress all evidence obtained from law enforcement's "unreasonable seizure." The circuit court granted the motion and suppressed the evidence. The State appeals, arguing the circuit court's findings of fact were against the manifest weight of the evidence and that the court erred as a matter of law in granting the motion to suppress. We reverse and remand.

¶ 3                       I. BACKGROUND

¶ 4　　　　　At approximately 10 p.m. on the day in question, Officer Rhea Flambeau of the Carthage Police Department saw a red Ford sedan with Iowa license plates pull off a public street into a Circle K gas station. Flambeau pulled his squad car into the gas station and observed that the red Ford was being driven by defendant and had no other passengers. A check of the vehicle's registration revealed an active warrant for the registered owner of the vehicle, Scott A. Gilman, for possession of methamphetamine and driving on a suspended license. Flambeau was able to obtain defendant's identification and verify that he was not Gilman, though the circumstances under which he did so go to the heart of the legal issues presented here. Flambeau then left the gas station. Later, he ran defendant's name through police dispatch and learned that his license was suspended. Approximately two hours later, Flambeau returned to the gas station and found defendant sitting in the passenger seat of the vehicle. Flambeau issued defendant a misdemeanor citation for driving while his license was suspended (625 ILCS 5/6-303(a) (West 2018)). The State subsequently enhanced the charge to a felony offense based on defendant's eight previous convictions for driving while his license was suspended and a statutory summary suspension he was serving at the time of the offense at issue (*id.* § 6-303(d-3)).

¶ 5　　　　　　　　　　　　　A. Motion to Suppress

¶ 6　　　　　Defendant filed a motion to suppress all evidence "obtained as a result of his illegal stop and subsequent arrest." Defendant argued that Flambeau threatened him with arrest if he did not produce identification. He alleged this detention was completely unnecessary, as Flambeau learned or could have learned of Gilman's description via police dispatch and discovered that defendant did not match that description. In either scenario, defendant argued that the encounter violated his fourth amendment rights under the United States Constitution (U.S. Const., amend.

IV). The State argued the stop was reasonable and the request for defendant's identification was permissible.

¶ 7                                                B. Suppression Hearing

¶ 8            The circuit court held a hearing on the motion to suppress in May 2022. Defendant testified in support of his motion, while the State presented the testimony of Flambeau.

¶ 9                                                1. *Defendant*

¶ 10          Defendant testified that on the evening of December 3, 2018, he was purchasing gas at the Circle K gas station in Carthage, Illinois. He was on his way into the gas station when he encountered Flambeau. Flambeau stepped in front of him and asked if he was the registered owner of the red Ford sedan. Defendant responded he was not, and Flambeau then requested his identification. Defendant responded "no," because he had "done nothing wrong." He tried to walk past Flambeau, but Flambeau stepped in front of him again "with his hand on his hip by his pistol" and said "that if I didn't produce my [identification] right then, that I would be going to jail." Defendant produced his identification, and after reviewing it, Flambeau said he was "free to go."

¶ 11          Defendant testified that the vehicle belonged to Gilman, whom he described as "[a]pproximately 5'10", about 200 pounds, balding, older than I am." Defendant described his own physical stature as "5'4", about 120 [pounds], long hair" and stated that he looked nothing like Gilman.

¶ 12          Between an hour to two hours after the initial encounter, defendant was sitting in the passenger seat of the Ford at the Circle K, waiting "for a ride to come pick [him] up," when Flambeau approached the vehicle and removed defendant from the passenger seat and informed him that he was under arrest for driving without a license.

¶ 13        On cross-examination, defendant admitted he was the only person in the vehicle and that nobody else traveled with him to the gas station.

¶ 14                              *2. Officer Flambeau*

¶ 15        After the circuit court denied the State's request to find that defendant had failed to establish a *prima facie* case, the State called Flambeau to testify. As the events in question occurred more than three years prior, Flambeau needed to review his written report before his testimony. Flambeau testified that, on the date and time in question, he was on patrol and in uniform. While he was pulling into the Circle K gas station, he observed a red Ford, with Iowa plates and a single male occupant, pull into the gas station off of a public street just before he did. Flambeau parked his vehicle and went into the gas station before returning to the squad car. He then conducted a check of the Ford's registration through police dispatch. Dispatch informed him that the owner of the vehicle, Gilman, had an active warrant for possession of methamphetamine and driving on a suspended license.

¶ 16        According to Flambeau's report, he observed defendant go inside the gas station; Flambeau approached defendant as he returned to the vehicle. From his recollection, Flambeau asked defendant if he was the registered owner of the vehicle, and defendant responded that Gilman, not defendant, was the owner. Flambeau then asked defendant for verification of his identity and, to Flambeau's memory, "[defendant] just willingly provided me with his identification." Flambeau did not recall any type of confrontation or threat of arrest. He did not take defendant at his word that he was not the registered owner of the vehicle, as "people with warrants often lie." Once he realized defendant was not the registered owner, he returned the identification and left the gas station.

¶ 17 Flambeau said that if he requested identification from a person in a consensual encounter and the person refused, his practice was to move on without threatening arrest. Only if a person was seized and refused a request to provide identification would he threaten arrest for obstructing identification. If the individual did not have a photographic identification card on their person, he would provide dispatch with the name and birthdate of the individual to confirm the physical description matched the information provided. He did not recall telling defendant he would be placed under arrest for obstructing identification, and his report did not indicate he asked dispatch for defendant's physical description based on name and birthdate.

¶ 18 Flambeau subsequently ran defendant's information through dispatch and discovered his license was suspended. He returned to the gas station and obtained defendant's consent to search his person and the vehicle. Defendant was read his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and admitted to driving to the gas station. Defendant was issued a citation and released with a notice to appear.

¶ 19 On cross-examination, Flambeau clarified that he saw defendant pull into the gas station and that he parked at the same pump on the opposite side, so he would have observed defendant in the driver's seat out of the squad car's passenger window. When he ran the registration, he was not given the description of Gilman, nor did he ask for it, even though he had an opportunity to do so. Once he was informed the registered owner had an active warrant, he approached defendant.

¶ 20                                  C. Circuit Court's Order

¶ 21 In a written opinion, the circuit court found defendant's version of the encounter more credible, as there was no indication Flambeau had an independent recollection of the events and instead testified based on his written report. Further, the court found that Flambeau conducted

a valid investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), when he asked defendant if he was the registered owner of the Ford, as there was reasonable, articulable suspicion of a crime because the registered owner of the vehicle had an active warrant and a suspended license. However, when defendant initially refused to produce his license, Flambeau "changed the dynamics" of the *Terry* stop by threatening to arrest him. At this point, the court concluded that Flambeau should have contacted dispatch for the physical description of Gilman. Upon receiving the description, Flambeau would have realized that defendant was not Gilman, and the encounter would have ended without defendant providing his name or identification. The court was "troubled" because the description of Gilman was readily available to Flambeau, there was ample time to ask for the description, and defendant did not "even come close to matching that description." Accordingly, Flambeau's actions went beyond the scope of a *Terry* stop, and the "encounter should have never taken place." The court granted defendant's motion to suppress.

¶ 22    The State timely filed a certificate of impairment, and this appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    The State argues that the circuit court erred when assessing the credibility of the witnesses and compounded this error with the "almost non-existent" reasoning for placing less weight on Flambeau's testimony. However, even if the court did not err in assessing credibility, and defendant was seized, the request for defendant's identification was proper, and there was no requirement that a description of the registered owner of the red Ford sedan needed to be requested before approaching defendant.

¶ 25    In reviewing the circuit court's ruling on a motion to suppress, we employ a bifurcated standard of review. *People v. Hill*, 2020 IL 124595, ¶ 14 (citing *Ornelas v. United States*, 517 U.S. 690 (1996)). The circuit court's factual findings are accorded great deference, and

a reviewing court will reverse only if those findings are against the manifest weight of the evidence. *Id.* "This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Jones*, 215 Ill. 2d 261, 268 (2005). "However, this court may assess the established facts in relation to the issues and draw our own conclusions when deciding what relief, if any, should be granted." *Hill*, 2020 IL 124595, ¶ 14. Accordingly, the circuit court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *Id.*

¶ 26 Despite the State's speculative arguments to the contrary, we largely accept the circuit court's findings of fact and note that the court found that Flambeau had a reasonable, articulable suspicion that criminal activity was afoot "because the registered owner was suspended and there was a warrant for his arrest." (Of course, this is an acknowledgement that Flambeau witnessed defendant driving or in constructive control of the vehicle, and to the extent the opinion of the court could be read to the contrary, the evidence of such a conclusion is so unreasonable, improbable, and unsatisfactory, that a different conclusion is clearly required.)

¶ 27 On the question of whether the law supports suppression of the evidence in this case, the issue as identified by the parties is whether the request for identification under threat of arrest "change[d] the dynamics" of the stop and whether Flambeau was required to obtain the description of Gilman before taking this step.

¶ 28 The fourth amendment of the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" (U.S. Const., amend. IV) and is applicable to the states through the fourteenth amendment. See *Elkins v. United States*, 364 U.S. 206, 213 (1960). "[T]he ultimate

touchstone of the Fourth Amendment is 'reasonableness' " (*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)), and the functional purpose of the amendment is the imposition of "a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions" (*People v. McDonough*, 239 Ill. 2d 260, 266 (2010) (citing *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979))). Generally, courts will suppress evidence obtained in violation of the fourth amendment pursuant to the fruit-of-the-poisonous-tree doctrine, an outgrowth of the exclusionary rule, providing that any evidence obtained by exploiting a fourth amendment violation is prohibited. *People v. Bonilla*, 2018 IL 122484, ¶ 35.

¶ 29 "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). An exception to the warrant requirement was promulgated by the United States Supreme Court in *Terry*, in that "a police officer may stop and detain a person for temporary questioning, absent probable cause to arrest, if the officer has a reasonable and articulable suspicion the person is committing, has committed, or is about to commit a crime." *People v. Austin*, 365 Ill. App. 3d 496, 503 (2006). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

¶ 30 Initially, the circuit court's finding that defendant was seized when Flambeau "began his inquiry" was error. It is well established that not every encounter between police and a private citizen results in seizure. Instead, such encounters have been divided into three categories:

> " '(1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as "*Terry* stops," which must be supported by

reasonable, articulable suspicion of criminal activity; and (3) consensual encounters, which involve no coercion or detention and thus do not implicate the fourth amendment.' " *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 26 (quoting *People v. Lake*, 2015 IL App (4th) 130072, ¶ 35).

¶ 31 The United States Supreme Court has repeatedly held that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions" (*Florida v. Bostick*, 501 U.S. 429, 434 (1991)); as long as "a reasonable person would feel free 'to disregard the police and go about his business,'[citation] the encounter is consensual and no reasonable suspicion is required" (*id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991))). Generally, approaching an individual and asking them questions and requesting identification by itself does not constitute a seizure. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion).

¶ 32 Here, we believe that the facts as found by the circuit court do not support the conclusion that defendant was seized when Flambeau began his inquiry. Asking defendant his name did not raise this encounter to the level of a *Terry* stop. Application of the *Mendenhall* factors to the totality of the circumstances also does not lead to the conclusion that defendant was seized during the initial request for identification. See *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (applying the following factors to in evaluating whether a seizure occurred without the person attempting to leave: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests). We note that, after defendant disregarded the initial request for identification, he attempted to step around Flambeau and go about his business; this is a clear indication that defendant felt free to leave the encounter.

¶ 33        Nonetheless, we agree that the encounter ripened into a *Terry* stop—a temporary investigatory seizure—once Flambeau made it clear that defendant would not be permitted to leave without identifying himself and verifying that information. The parties disagree as to whether Flambeau exceeded the allowable scope of the *Terry* stop and employed the least intrusive investigative means necessary to dispel his suspicions. Both the State and defendant point to a number of cases attempting to analogize this situation to the holdings of courts evaluating traffic stops, not street stops. See, *e.g.*, *People v. Cummings*, 2016 IL 115769; *Rodriguez v. United States*, 575 U.S. 348 (2015); *State v. Martinez-Arvealo*, 340 Ga. App. 271, 797 S.E. 2d 18 (Ga. Ct. App. 2017). We find it unnecessary to engage in an analysis of these arguments as the matter is disposed of on a straightforward evaluation of *Terry* principles. See *Blagden v. McMillin*, 2023 IL App (4th) 220238, ¶ 40 (noting *de novo* review requires the court to consider the matter anew as if the case had not been heard before and no deference to the circuit court's conclusions or rationale is required).

¶ 34        The evaluation of a *Terry* stop entails a dual inquiry in deciding whether a law enforcement officer's investigatory detention is reasonable: (1) "whether the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. The officer's conduct is judged by an objective standard, which analyzes whether the facts known to the officer at the moment of the stop justify the action taken. *People v. Hackett*, 2012 IL 111781, ¶ 29.

¶ 35        In considering the first aspect of the foregoing inquiry, it is apparent in this case that Flambeau was justified in initiating a *Terry* stop. The knowledge that the registered owner of a vehicle is subject to seizure for a violation of law or that their license was revoked or suspended is sufficient on its own to give an officer reasonable suspicion to detain the driver of a vehicle or

its occupants. See *Prouse*, 440 U.S. at 663; *Village of Lake in the Hills v. Lloyd*, 227 Ill. App. 3d 351, 353 (1992); *People v. Barnes*, 152 Ill. App. 3d 1004, 1006 (1987). The aforementioned proposition emanates from the commonsense presumption that the registered owner of a vehicle is often the driver. *Lloyd*, 227 Ill. App. 3d at 354; *Barnes*, 152 Ill. App. 3d at 1006.

¶ 36    Under the second part of the inquiry, the issue here is whether the request for identification was reasonably related in scope to the circumstances which justified the stop and whether the officer was required to request a description of Gilman before demanding identification.

¶ 37    Turning to the request for defendant's identification under threat of arrest, United States Supreme Court decisions "make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 186 (2004) (collecting cases). We find that demanding defendant to disclose his identity under threat of arrest did not take the encounter beyond the bounds of *Terry*. The entire purpose of the encounter in this case was to ascertain the identity of the individual driving the vehicle. The principles of *Terry* "permit a State to require a suspect to disclose his name in the course of a *Terry* stop." *Hiibel*, 542 U.S. at 187. Illinois has codified the principles of *Terry* via statute, requiring the disclosure of identity by law. See 725 ILCS 5/107-14 (West 2018). "The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity." *Hiibel*, 542 U.S. at 188. Accordingly, Flambeau could compel defendant to produce his identification under threat of arrest and did not "change the dynamics" or exceed the scope of the *Terry* stop. See *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 64.

¶ 38        Finally, we turn to whether failing to request the description of Gilman from police dispatch ran afoul of *Terry*'s mandate that the least intrusive investigative means possible be employed to dispel an officer's suspicion.

> "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. [Citation.]. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. [Citations.] The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (Internal quotations omitted.) *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).

¶ 39        We find it telling that neither the circuit court in its order nor the parties in their briefing cites to authority directly on point. Our search has failed to reveal any precedent that requires an officer to obtain the description of the registered owner of a vehicle with an active warrant and suspended license when the officer encounters the vehicle being driven by an individual. *Cf. People v. Galvez*, 401 Ill. App. 3d 716 (2010) (finding a different result was warranted when there are two registered owners of a vehicle, only one of whom possessed a suspended license). In the traffic stop context, this is unsurprising, as checking driver's licenses has been found to be an ordinary inquiry incident to the stop and is accepted as a valid practice. *Rodriguez*, 575 U.S. at 355. These inquiries are allowed even once reasonable suspicion has

dissipated. See *People v. Hernandez*, 2012 IL App (2d) 110266, ¶ 7; *Cummings*, 2016 IL 115769, ¶ 18.

¶ 40　　　　Under the facts as found by the circuit court, Flambeau was made aware that the registered owner of a vehicle had an active warrant and a suspended license. The name of the registered owner in this case is one that is commonly identified as corresponding to a male, and Flambeau observed a male occupant driving the car. When defendant left his car to pay for fuel, Flambeau decided to act, as he had reasonable suspicion based on the totality of the circumstances Gilman was driving the vehicle. See *Prouse*, 440 U.S. at 663; *Lloyd*, 227 Ill. App. 3d at 353; *Barnes*, 152 Ill. App. 3d at 1006. Flambeau's reasonable suspicion did not dissipate after defendant's denial that he was Gilman, and he was entitled to require defendant's identification pursuant to *Terry*. We believe the inquiry here centers on whether the information known to the officer was sufficient to justify his actions; we decline to flip the inquiry and focus not on what was known, but on what other information might have been learned. Doing so would represent the kind of *post hoc* evaluation the Court in *Sharpe* cautioned against.

¶ 41　　　　The touchstone of the fourth amendment is reasonableness, and we cannot say that in light of the circumstances and information known, Flambeau was unreasonable in approaching defendant without obtaining Gilman's description or requesting the description after defendant's initial refusal to provide identification. The momentary seizure of defendant was based on reasonable suspicion, sufficiently limited in scope to satisfy the conditions of an investigative seizure, and diligently pursued in a manner that was likely to quickly confirm or dispel Flambeau's suspicions. See *People v. Hardy*, 142 Ill. App. 3d 108, 114 (1986).

¶ 42　　　　　　　　　　　　　　　III. CONCLUSION

¶ 43　　　　For the reasons stated, we reverse the judgment of the circuit court.

¶ 44          Reversed and remanded.